# Exhibit 9

Case 1:06-cv-00200-RMC   Document 5-10   Filed 02/25/2006   Page 1 of 7

5 of 5 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

December 16, 2005 Friday
Correction Appended
Late Edition - Final

**SECTION:** Section A; Column 1; Foreign Desk; Pg. 1

**LENGTH:** 3633 words

**HEADLINE:** Bush Lets U.S. Spy on Callers Without Courts

**BYLINE:** By JAMES RISEN and ERIC LICHTBLAU; Barclay Walsh contributed research for this article.

**DATELINE:** WASHINGTON, Dec. 15

**BODY:**

Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval was a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to the United States, the officials said. Defenders of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the

administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

Dealing With a New Threat

While many details about the program remain secret, officials familiar with it say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands since the program began, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy.

Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States -- including American citizens, permanent legal residents, tourists and other foreigners -- is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, they said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in the United States by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people in the United States who are linked, even if indirectly, to suspected terrorists through the chain of phone numbers and e-mail addresses, according to several officials who know of the operation. Under the special program, the agency monitors their international communications, the officials said. The agency, for example, can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic communications, those officials say, meaning that calls from that New Yorker to someone in California could not be monitored without first going to the Federal Intelligence Surveillance Court.

A White House Briefing

After the special program started, Congressional leaders from both political parties were brought to Vice President Dick Cheney's office in the White House. The leaders, who included the chairmen and ranking members of the Senate and House intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Lt. Gen. Michael V. Hayden of the Air Force, who was then the agency's director and is now a full general and the principal deputy director of national intelligence, and George J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential order and the eavesdropping program. Some of them declined to comment about the matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles on the intelligence committees, officials familiar with the program said. After a 2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice chairman of the Senate Intelligence Committee that year, wrote a letter to Mr. Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the program's legality. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?' " he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

The standard of proof required to obtain a warrant from the Foreign Intelligence Surveillance Court is generally considered lower than that required for a criminal warrant -- intelligence officials only have to show probable cause that someone may be "an agent of a foreign power," which includes international terrorist groups -- and the secret court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754

warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

The N.S.A. domestic spying operation has stirred such controversy among some national security officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses -- including eavesdropping on Vietnam War protesters and civil rights activists -- by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

Concerns and Revisions

Several senior government officials say that when the special operation began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping.

According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens."

President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

The Legal Line Shifts

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, cited "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

**URL:** http://www.nytimes.com

**CORRECTION-DATE:** December 28, 2005

**CORRECTION:**

Because of an editing error, a front-page article on Dec. 16 about a decision by President Bush to authorize the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without warrants ordinarily required for domestic spying misstated the name of the court that would normally issue those warrants. It is the Foreign -- not Federal --Intelligence Surveillance Court.

**GRAPHIC:** Photo: In 2002, President Bush toured the National Security Agency at Fort Meade, Md., with Lt. Gen. Michael V. Hayden, who was then the agency's director and is now a full general and the principal deputy director of national intelligence. (Photo by Doug Mills/Associated Press)(pg. A16)Chart: "A Half-Century of Surveillance"HISTORY -- Created in 1952, the National Security Agency is the biggest American intelligence agency, with more than 30,000 employees at Fort Meade, Md., and listening posts around the world. Part of the Defense Department, it is the successor to the State Department's "Black Chamber" and American military eavesdropping and code-breaking operations that date to the early days of telegraph and telephone communications.MISSION -- The N.S.A. runs the eavesdropping hardware of the American intelligence system, operating a huge network of satellites and listening devices around the world. Traditionally, its mission has been to gather intelligence overseas on foreign enemies by breaking codes and tapping into telephone and computer communications.SUCCESSES -- Most of the agency's successes remain secret, but a few have been revealed. The agency listened to Soviet pilots and ground controllers during the shooting down of a civilian South Korean airliner in 1983
traced a disco bombing in Berlin in 1986 to Libya through diplomatic messages
 and, more recently, used the identifying chips in cellphones to track terrorist suspects after the 2001 attacks.DOMESTIC ACTIVITY -- The disclosure in the 1970's of widespread surveillance on political dissenters and other civil rights abuses led to restrictions at the N.S.A. and elsewhere on the use of domestic wiretaps. The N.S.A. monitors United Nations delegations and some foreign embassy lines on American soil, but is generally prohibited from listening in on the conversations of anyone inside the country without a special court order.OFFICIAL RULES -- Since the reforms of the late 1970's, the N.S.A. has generally been permitted to target the communications of people on American soil only if they are believed to be "agents of a foreign power" -- a foreign nation or international terrorist group -- and a warrant is obtained from the Foreign Intelligence Surveillance Court.EXPANDED ROLE -- Months after the terror attacks of Sept. 11, 2001, President Bush signed a secret executive order that relaxed restrictions on domestic spying by the N.S.A., according to officials with knowledge of the order. The order allows the agency to monitor without warrants the international phone calls and e-mail messages of some Americans and others inside the United States.(pg. A16)

**LOAD-DATE:** December 16, 2005