# Exhibit 23

Justice Deputy Resisted Parts Of Spy Program The New York Times January

Copyright 2006 The New York Times Company
The New York Times

January 1, 2006 Sunday
Late Edition - Final

**SECTION:** Section 1; Column 5; National Desk; Pg. 1

**LENGTH:** 1173 words

**HEADLINE:** Justice Deputy Resisted Parts Of Spy Program

**BYLINE:** By ERIC LICHTBLAU and JAMES RISEN

**DATELINE:** WASHINGTON, Dec. 31

**BODY:**

A top Justice Department official objected in 2004 to aspects of the National Security Agency's domestic surveillance program and refused to sign on to its continued use amid concerns about its legality and oversight, according to officials with knowledge of the tense internal debate. The concerns appear to have played a part in the temporary suspension of the secret program.

The concerns prompted two of President Bush's most senior aides -- Andrew H. Card Jr., his chief of staff, and Alberto R. Gonzales, then White House counsel and now attorney general -- to make an emergency visit to a Washington hospital in March 2004 to discuss the program's future and try to win the needed approval from Attorney General John Ashcroft, who was hospitalized for gallbladder surgery, the officials said.

The unusual meeting was prompted because Mr. Ashcroft's top deputy, James B. Comey, who was acting as attorney general in his absence, had indicated he was unwilling to give his approval to certifying central aspects of the program, as required under the White House procedures set up to oversee it.

With Mr. Comey unwilling to sign off on the program, the White House went to Mr. Ashcroft -- who had been in the intensive care unit at George Washington University Hospital with pancreatitis and was housed under unusually tight security -- because "they needed him for certification," according to an official briefed on the episode. The official, like others who discussed the issue, spoke on the condition of anonymity because of the classified nature of the program.

Mr. Comey declined to comment, and Mr. Gonzales could not be reached.

Accounts differed as to exactly what was said at the hospital meeting between Mr. Ashcroft and the White House advisers. But some officials said that Mr. Ashcroft, like his deputy, appeared reluctant to give Mr. Card and Mr. Gonzales his authorization to continue with aspects of the program in light of concerns among some senior government officials about whether the proper oversight was in place at the security agency and whether the president had the legal and constitutional authority to conduct such an operation.

It is unclear whether the White House ultimately persuaded Mr. Ashcroft to give his approval to the program after the meeting or moved ahead without it.

The White House and Mr. Ashcroft, through a spokeswoman, declined to comment Saturday on the hospital meeting. A White House spokeswoman, Jeannie Mamo, said she could not discuss any aspect of the meeting or the internal debate surrounding it, but said: "As the president has stated, the intelligence activities that have been under way to prevent future terrorist attacks have been approved at the highest levels of the Justice Department."

The domestic eavesdropping program was publicly disclosed in mid-December by The New York Times. President Bush, in acknowledging the existence of the program in a televised appearance two weeks ago, said that tight controls had been imposed over the surveillance operation and that the program was reviewed every 45 days by top government officials, including at the Justice Department.

"The review includes approval by our nation's top legal officials, including the attorney general and the counsel to the president," Mr. Bush said, adding that he had personally reauthorized the program's use more than 30 times since it began. He gave no indication of any internal dissent over the reauthorization.

Questions about the surveillance operation are likely to be central to a Congressional hearing planned by Senator Arlen Specter, the Pennsylvania Republican who heads the Judiciary Committee. Mr. Specter, like some other Republicans and many Democrats in Congress, has voiced deep concerns about the program and Mr. Bush's legal authority to bypass the courts to order domestic wiretaps without warrants.

What is known is that in early 2004, about the time of the hospital visit, the White House suspended parts of the program for several months and moved ahead with more stringent requirements on the security agency on how the program was used, in part to guard against abuses.

The concerns within the Justice Department appear to have led, at least in part, to the decision to suspend and revamp the program, officials said. The Justice Department then oversaw a secret audit of the surveillance program.

The audit examined a selection of cases to see how the security agency was running the program. Among other things, it looked at how agency officials went about determining that they had probable cause to believe that people in the United States, including American citizens, had sufficient ties to Al Qaeda to justify eavesdropping on their phone calls and e-mail messages without a court warrant. That review is not known to have found any instances of abuses.

The warrantless domestic eavesdropping program was first authorized by President Bush in the months after the Sept. 11, 2001, attacks, officials said. Initially, it was focused on communications into and out of Afghanistan, including calls between Afghanistan and the United States, people familiar with the operation said. But the program quickly expanded.

Several senior government officials have said that when the special operation first began, there were few controls on it. Some agency officials wanted nothing to do with it, apparently fearful of participating in an illegal operation, officials have said.

At its outset in 2002, the surveillance operation was so highly classified that even Larry Thompson, the deputy attorney general to Mr. Ashcroft, who was active in most of the government's most classified counterterrorism operations, was not given access to the program.

That led to uncertainties about the chain of command in overseeing law enforcement activities connected to the program, officials said, and it appears to have spurred concerns within the Justice Department over its use. Mr. Thompson's successor, Mr. Comey, was eventually authorized to take part in the program and to review intelligence material that grew out of it, and officials said he played a part in overseeing the reforms that were put in place in 2004.

But even after the imposition of the new restrictions last year, the agency maintained the authority to choose its eavesdropping targets and did not have to get specific approval from the Justice Department or other Bush officials before it began surveillance on phone calls or e-mail messages. The decision on whether someone is believed to be linked to Al Qaeda and should be monitored is left to a shift supervisor at the agency, the White House has said.

The White House has vigorously defended the legality and value of the domestic surveillance program, saying it has saved many American lives by allowing the government to respond more quickly and flexibly to threats. The Justice Department, meanwhile, said Friday that it had opened a criminal investigation into the unauthorized disclosure of the existence of the program.

**URL:** http://www.nytimes.com

**LOAD-DATE:** January 1, 2006