# Exhibit 28

| 94TH CONGRESS<br>2d Session | SENATE | REPORT<br>No. 94–755 |

# INTELLIGENCE ACTIVITIES AND THE RIGHTS OF AMERICANS

———

## BOOK II

———

## FINAL REPORT

OF THE

### SELECT COMMITTEE
### TO STUDY GOVERNMENTAL OPERATIONS

WITH RESPECT TO

### INTELLIGENCE ACTIVITIES
### UNITED STATES SENATE

TOGETHER WITH

### ADDITIONAL, SUPPLEMENTAL, AND SEPARATE VIEWS



APRIL 26 (legislative day, APRIL 14), 1976

———

U.S. GOVERNMENT PRINTING OFFICE

68-786 O                  WASHINGTON : 1976

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $3.60

# I. INTRODUCTION AND SUMMARY

The resolution creating this Committee placed greatest emphasis on whether intelligence activities threaten the "rights of American citizens." [1]

The critical question before the Committee was to determine how the fundamental liberties of the people can be maintained in the course of the Government's effort to protect their security. The delicate balance between these basic goals of our system of government is often difficult to strike, but it can, and must, be achieved. We reject the view that the traditional American principles of justice and fair play have no place in our struggle against the enemies of freedom. Moreover, our investigation has established that the targets of intelligence activity have ranged far beyond persons who could properly be characterized as enemies of freedom and have extended to a wide array of citizens engaging in lawful activity.

Americans have rightfully been concerned since before World War II about the dangers of hostile foreign agents likely to commit acts of espionage. Similarly, the violent acts of political terrorists can seriously endanger the rights of Americans. Carefully focused intelligence investigations can help prevent such acts.

But too often intelligence has lost this focus and domestic intelligence activities have invaded individual privacy and violated the rights of lawful assembly and political expression. Unless new and tighter controls are established by legislation, domestic intelligence activities threaten to undermine our democratic society and fundamentally alter its nature.

We have examined three types of "intelligence" activities affecting the rights of American citizens. The first is intelligence collection—such as infiltrating groups with informants, wiretapping, or opening letters. The second is dissemination of material which has been collected. The third is covert action designed to disrupt and discredit the activities of groups and individuals deemed a threat to the social order. These three types of "intelligence" activity are closely related in the practical world. Information which is disseminated by the intelligence community [2] or used in disruptive programs has usually been obtained through surveillance. Nevertheless, a division between collection, dissemination and covert action is analytically useful both in understanding why excesses have occurred in the past and in devising remedies to prevent those excesses from recurring.

---

[1] S. Res. 21, sec. 2(12). The Senate specifically charged this Committee with investigating "the conduct of domestic intelligence or counterintelligence operations against United States citizens." (Sec. 2(2)) The resolution added several examples of specific charges of possible "illegal, improper or unethical" governmental intelligence activities as matters to be fully investigated (Sec. (2) (1)—CIA domestic activities; Sec. (2) (3)—Huston Plan; Sec. (2) (10)—surreptitous entries, electronic surveillance, mail opening.)

[2] Just as the term "intelligence activity" encompasses activities that go far beyond the collection and analysis of information, the term "intelligence community" includes persons ranging from the President to the lowest field operatives of the intelligence agencies.

68–786 O - 76 - 2

2

*A. Intelligence Activity: A New Form of Governmental Power to Impair Citizens' Rights*

A tension between order and liberty is inevitable in any society. A Government must protect its citizens from those bent on engaging in violence and criminal behavior, or in espionage and other hostile foreign intelligence activity. Many of the intelligence programs reviewed in this report were established for those purposes. Intelligence work has, at times, successfully prevented dangerous and abhorrent acts, such as bombings and foreign spying, and aided in the prosecution of those responsible for such acts.

But, intelligence activity in the past decades has, all too often, exceeded the restraints on the exercise of governmental power which are imposed by our country's Constitution, laws, and traditions.

Excesses in the name of protecting security are not a recent development in our nation's history. In 1798, for example, shortly after the Bill of Rights was added to the Constitution, the Alien and Sedition Acts were passed. These Acts, passed in response to fear of pro-French "subversion", made it a crime to criticize the Government.[3] During the Civil War, President Abraham Lincoln suspended the writ of habeas corpus. Hundreds of American citizens were prosecuted for anti-war statements during World War I, and thousands of "radical" aliens were seized for deportation during the 1920 Palmer Raids. During the Second World War, over the opposition of J. Edgar Hoover and military intelligence,[4] 120,000 Japanese-Americans were apprehended and incarcerated in detention camps.

Those actions, however, were fundamentally different from the intelligence activities examined by this Committee. They were generally executed overtly under the authority of a statute or a public executive order. The victims knew what was being done to them and could challenge the Government in the courts and other forums. Intelligence activity, on the other hand, is generally covert. It is concealed from its victims[5] and is seldom described in statutes or explicit execu-

---

[3] The Alien Act provided for the deportation of all aliens judged "dangerous to the peace and safety" of the nation. (1 Stat. 570, June 25, 1798) The Sedition Act made it a federal crime to publish "false, scandalous and malicious writing" against the United States government, the Congress, or the President with the intent to "excite against them" the "hatred of the good people of the United States" or to "encourage or abet any hostile designs of any foreign nation against the United States." (1 Stat. 596, July 14, 1798) There were at least 25 arrests, 15 indictments, and 10 convictions under the Sedition Act. (See James M. Smith, *Freedom's Fetters: The Alien and Sedition Laws and American Civil Liberties* (Ithaca: Cornell U. Press. 1956).)

[4] Francis Biddle, *In Brief Authority* (Garden City: Doubleday, 1962), p. 224; Roger Daniels, *Concentration Camps USA: Japanese Americans and World War II* (New York: Holt, Rinehart, and Winston, 1971), p. 66.

[5] Many victims of intelligence activities have claimed in the past that they were being subjected to hostile action by their government. Prior to this investigation, most Americans would have dismissed these allegations. Senator Philip Hart aptly described this phenomenon in the course of the Committee's public hearings on domestic intelligence activities:

"As I'm sure others have, I have been told for years by, among others, some of my own family, that this is exactly what the Bureau was doing all of the time, and in my great wisdom and high office, I assured them that they were [wrong]—it just wasn't true, it couldn't happen. They wouldn't do it. What you have described is a series of illegal actions intended squarely to deny

3

tive orders. The victim may never suspect that his misfortunes are the
intended result of activities undertaken by his government, and accord-
ingly may have no opportunity to challenge the actions taken against
him.

It is, of course, proper in many circumstances—such as developing
a criminal prosecution—for the Government to gather information
about a citizen and use it to achieve legitimate ends, some of which
might be detrimental to the citizen. But in criminal prosecutions, the
courts have struck a balance between protecting the rights of the
accused citizen and protecting the society which suffers the conse-
quences of crime. Essential to the balancing process are the rules of
criminal law which circumscribe the techniques for gathering evi-
dence,[5] the kinds of evidence that may be collected, and the uses to
which that evidence may be put. In addition, the criminal defendant
is given an opportunity to discover and then challenge the legality of
how the Government collected information about him and the use
which the Government intends to make of that information.

This Committee has examined a realm of governmental informa-
tion collection which has not been governed by restraints comparable
to those in criminal proceedings. We have examined the collection
of intelligence about the political advocacy and actions and the private
lives of American citizens. That information has been used covertly to
discredit the ideas advocated and to "neutralize" the actions of their
proponents. As Attorney General Harlan Fiske Stone warned in 1924,
when he sought to keep federal agencies from investigating "political
or other opinions" as opposed to "conduct . . . forbidden by the laws":

> When a police system passes beyond these limits, it is dan-
> gerous to the proper administration of justice and to human
> liberty, which it should be our first concern to cherish.
>     . . . There is always a possibility that a secret police may
> become a menace to free government and free institutions be-
> cause it carries with it the possibility of abuses of power
> which are not always quickly apprehended or understood.[7]

Our investigation has confirmed that warning. We have seen seg-
ments of our Government, in their attitudes and action, adopt tactics
unworthy of a democracy, and occasionally reminiscent of the tactics
of totalitarian regimes. We have seen a consistent pattern in which
programs initiated with limited goals, such as preventing criminal

---

First Amendment rights to some Americans. That is what my children have
told me was going on. Now I did not believe it.

"The trick now, as I see it, Mr. Chairman, is for this committee to be able
to figure out how to persuade the people of this country that indeed it did
go on. And how shall we insure that it will never happen again? But it will
happen repeatedly unless we can bring ourselves to understand and accept
that it did go on." Senator Philip Hart, 11/18/75, Hearings, Vol. 6, p. 41.

[5] As the Supreme Court noted in *Miranda v. Arizona*, 384 U.S. 436, 483, 486
(1966), even before the Court required law officers to advise criminal suspects
of their constitutional rights before custodial interrogation, the FBI had "an
exemplary record" in this area—a practice which the Court said should be
"emulated by state and local law enforcement agencies." This commendable FBI
tradition in the general field of law enforcement presents a sharp contrast to the
widespread disregard of individual rights in FBI domestic intelligence opera-
tions examined in the balance of this Report.

[7] *New York Times*, 5/13/24.

4

violence or identifying foreign spies, were expanded to what witnesses characterized as "vacuum cleaners",[8] sweeping in information about lawful activities of American citizens.

The tendency of intelligence activities to expand beyond their initial scope is a theme which runs through every aspect of our investigative findings. Intelligence collection programs naturally generate ever-increasing demands for new data. And once intelligence has been collected, there are strong pressures to use it against the target.

The pattern of intelligence agencies expanding the scope of their activities was well described by one witness, who in 1970 had coordinated an effort by most of the intelligence community to obtain authority to undertake more illegal domestic activity:

> The risk was that you would get people who would be susceptible to political considerations as opposed to national security considerations, or would construe political considerations to be national security considerations, to move from the kid with a bomb to the kid with a picket sign, and from the kid with the picket sign to the kid with the bumper sticker of the opposing candidate. And you just keep going down the line.[9]

In 1940, Attorney General Robert Jackson saw the same risk. He recognized that using broad labels like "national security" or "subversion" to invoke the vast power of the government is dangerous because there are "no definite standards to determine what constitutes a 'subversive activity', such as we have for murder or larceny." Jackson added:

> Activities which seem benevolent or helpful to wage earners, persons on relief, or those who are disadvantaged in the struggle for existence may be regarded as 'subversive' by those whose property interests might be burdened thereby. Those who are in office are apt to regard as 'subversive' the activities of any of those who would bring about a change of administration. Some of our soundest constitutional doctrines were once punished as subversive. We must not forget that it was not so long ago that both the term 'Republican' and the term 'Democrat' were epithets with sinister meaning to denote persons of radical tendencies that were 'subversive' of the order of things then dominant.[10]

This wise warning was not heeded in the conduct of intelligence activity, where the "eternal vigilance" which is the "price of liberty" has been forgotten.

## B. The Questions

We have directed our investigation toward answering the following questions:

Which governmental agencies have engaged in domestic spying?

How many citizens have been targets of Governmental intelligence activity?

---

[8] Mary Jo Cook testimony, 12/2/75, Hearings, Vol. 6, p. 111; James B. Adams testimony, 12/2/75, Hearings, Vol. 6, p. 135.

[9] Tom Charles Huston testimony, 9/23/75, Hearings, Vol. 2, p. 45.

[10] "The Federal Prosecutor", *Journal of the American Judicature Society* (June, 1940), p. 18.

5

What standards have governed the opening of intelligence investigations and when have intelligence investigations been terminated?

Where have the targets fit on the spectrum between those who commit violent criminal acts and those who seek only to dissent peacefully from Government policy?

To what extent has the information collected included intimate details of the targets' personal lives or their political views, and has such information been disseminated and used to injure individuals?

What actions beyond surveillance have intelligence agencies taken, such as attempting to disrupt, discredit, or destroy persons or groups who have been the targets of surveillance?

Have intelligence agencies been used to serve the political aims of Presidents, other high officials, or the agencies themselves?

How have the agencies responded either to proper orders or to excessive pressures from their superiors? To what extent have intelligence agencies disclosed, or concealed them from, outside bodies charged with overseeing them?

Have intelligence agencies acted outside the law? What has been the attitude of the intelligence community toward the rule of law?

To what extent has the Executive branch and the Congress controlled intelligence agencies and held them accountable?

Generally, how well has the Federal system of checks and balances between the branches worked to control intelligence activity?

*C. Summary of the Main Problems*

The answer to each of these questions is disturbing. Too many people have been spied upon by too many Government agencies and to much information has beeen collected. The Government has often undertaken the secret surveillance of citizens on the basis of their political beliefs, even when those beliefs posed no threat of violence or illegal acts on behalf of a hostile foreign power. The Government, operating primarily through secret informants, but also using other intrusive techniques such as wiretaps, microphone "bugs", surreptitious mail opening, and break-ins, has swept in vast amounts of information about the personal lives, views, and associations of American citizens. Investigations of groups deemed potentially dangerous—and even of groups suspected of associating with potentially dangerous organizations—have continued for decades, despite the fact that those groups did not engage in unlawful activity. Groups and individuals have been harassed and disrupted because of their political views and their lifestyles. Investigations have been based upon vague standards whose breadth made excessive collection inevitable. Unsavory and vicious tactics have been employed—including anonymous attempts to break up marriages, disrupt meetings, ostracize persons from their professions, and provoke target groups into rivalries that might result in deaths. Intelligence agencies have served the political and personal objectives of presidents and other high officials. While the agencies often committed excesses in response to pressure from high officials in the Executive branch and Congress, they also occasionally initiated improper activities and then concealed them from officials whom they had a duty to inform.

Governmental officials—including those whose principal duty is to enforce the law—have violated or ignored the law over long periods of time and have advocated and defended their right to break the law.

6

The Constitutional system of checks and balances has not adequately controlled intelligence activities. Until recently the Executive branch has neither delineated the scope of permissible activities nor established procedures for supervising intelligence agencies. Congress has failed to exercise sufficient oversight, seldom questioning the use to which its apropriations were being put. Most domestic intelligence issues have not reached the courts, and in those cases when they have reached the courts, the judiciary has been reluctant to grapple with them.

Each of these points is briefly illustrated below, and covered in substantially greater detail in the following sections of the report.

### 1. The Number of People Affected by Domestic Intelligence Activity

United States intelligence agencies have investigated a vast number of American citizens and domestic organizations. FBI headquarters alone has developed over 500,000 domestic intelligence files,[11] and these have been augmented by additional files at FBI Field Offices. The FBI opened 65,000 of these domestic intelligence files in 1972 alone.[12] In fact, substantially more individuals and groups are subject to intelligence scrutiny than the number of files would appear to indicate, since typically, each domestic intelligence file contains information on more than one individual or group, and this information is readily retrievable through the FBI General Name Index.

The number of Americans and domestic groups caught in the domestic intelligence net is further illustrated by the following statistics:

—Nearly a quarter of a million first class letters were opened and photographed in the United States by the CIA between 1953–1973, producing a CIA computerized index of nearly one and one-half million names.[13]

—At least 130,000 first class letters were opened and photographed by the FBI between 1940–1966 in eight U.S. cities.[14]

—Some 300,000 individuals were indexed in a CIA computer system and separate files were created on approximately 7,200 Americans and over 100 domestic groups during the course of CIA's Operation CHAOS (1967–1973).[15]

—Millions of private telegrams sent from, to, or through the United States were obtained by the National Security Agency from 1947 to 1975 under a secret arrangement with three United States telegraph companies.[16]

—An estimated 100,000 Americans were the subjects of United States Army intelligence files created between the mid-1960's and 1971.[17]

—Intelligence files on more than 11,000 individuals and groups were created by the Internal Revenue Service between

---

[11] Memorandum from the FBI to the Senate Select Committee, 10/6/75.
[12] Memorandum from the FBI to the Senate Select Committee, 10/6/75.
[13] James Angleton testimony, 9/17/75, p. 28.
[14] See Mail Opening Report: Section IV, "FBI Mail Openings."
[15] Chief, International Terrorist Group testimony, Commission on CIA Activities Within the United States, 3/10/75, pp. 1485–1489.
[16] Statement by the Chairman, 11/6/75; re: SHAMROCK, Hearings, Vol. 5, pp. 57–60.
[17] See Military Surveillance Report: Section II, "The Collection of Information about the Political Activities of Private Citizens and Private Organizations."

7

1969 and 1973 and tax investigations were started on the basis
of political rather than tax criteria.[18]
 —At least 26,000 individuals were at one point catalogued
on an FBI list of persons to be rounded up in the event of a
"national emergency".[19]

### 2. Too Much Information Is Collected For Too Long

Intelligence agencies have collected vast amounts of information
about the intimate details of citizens' lives and about their participa-
tion in legal and peaceful political activities. The targets of intelli-
gence activity have included political adherents of the right and the
left, ranging from activitist to casual supporters. Investigations have
been directed against proponents of racial causes and women's rights,
outspoken apostles of nonviolence and racial harmony; establishment
politicians; religious groups; and advocates of new life styles. The
widespread targeting of citizens and domestic groups, and the exces-
sive scope of the collection of information, is illustrated by the fol-
lowing examples:

(a) The "Women's Liberation Movement" was infiltrated by in-
formants who collected material about the movement's policies, leaders,
and individual members. One report included the name of every
woman who attended meetings,[20] and another stated that each woman
at a meeting had described "how she felt oppressed, sexually or other-
wise".[21] Another report concluded that the movement's purpose was
to "free women from the humdrum existence of being only a wife and
mother", but still recommended that the intelligence investigation
should be continued.[22]

(b) A prominent civil rights leader and advisor to Dr. Martin
Luther King, Jr., was investigated on the suspicion that he might be
a Communist "sympathizer". The FBI field office concluded he was
not.[23] Bureau headquarters directed that the investigation continue—
using a theory of "guilty until proven innocent:"

> The Bureau does not agree with the expressed belief of the
> field office that _____[24] is not sympathetic to the
> Party cause. While there may not be any evidence that
> _____ is a Communist neither is there any substantial
> evidence that he is anti-Communist.[25]

(c) FBI sources reported on the formation of the Conservative
American Christian Action Council in 1971.[26] In the 1950's, the Bu-
reau collected information about the John Birch Society and passed

[18] See IRS Report: Section II, "Selective Enforcement for Nontax Purposes."
[19] Memorandum from A. H. Belmont to L. V. Boardman, 12/8/54. Many of the
memoranda cited in this report were actually written by FBI personnel other
than those whose names were indicated at the foot of the document as the author.
Citation in this report of specific memoranda by using the names of FBI personnel
which so appear is for documentation purposes only and is not intended to presume
authorship or even knowledge in all cases.
[20] Memorandum from Kansas City Field Office to FBI Headquarters, 10/20/70.
(Hearings, Vol. 6, Exhibit 54–3)
[21] Memorandum from New York Field Office to FBI Headquarters, 5/28/69,
p. 2. (Hearings, Vol. 6, Exhibit 54–1)
[22] Memorandum from Baltimore Field Office to FBI Headquarters, 5/11/70,
p. 2.
[23] Memorandum from New York Field Office to FBI Headquarters, 4/14/64.
[24] Name deleted by Committee to protect privacy.
[25] Memorandum from FBI Headquarters to New York Field Office 4/24/64, re
CPUSA, Negro question.
[26] James Adams testimony, 12/2/75, Hearings, Vol. 6, p. 137.

8

it to the White House because of the Society's "scurillous attack" on President Eisenhower and other high Government officials.[27]

(d) Some investigations of the lawful activities of peaceful groups have continued for decades. For example, the NAACP was investigated to determine whether it "had connections with" the Communist Party. The investigation lasted for over twenty-five years, although nothing was found to rebut a report during the first year of the investigation that the NAACP had a "strong tendency" to "steer clear of Communist activities."[28] Similarly, the FBI has admitted that the Socialist Workers Party has committed no criminal acts. Yet the Bureau has investigated the Socialist Workers Party for more than three decades on the basis of its revolutionary rhetoric—which the FBI concedes falls short of incitement to violence—and its claimed international links. The Bureau is currently using its informants to collect information about SWP members' political views, including those on "U.S. involvement in Angola," "food prices," "racial matters," the "Vietnam War," and about any of their efforts to support non-SWP candidates for political office.[29]

(e) National political leaders fell within the broad reach of intelligence investigations. For example, Army Intelligence maintained files on Senator Adlai Stevenson and Congressman Abner Mikva because of their participation in peaceful political meetings under surveillance by Army agents.[30] A letter to Richard Nixon, while he was a candidate for President in 1968, was intercepted under CIA's mail opening program.[31] In the 1960's President Johnson asked the FBI to compare various Senators' statements on Vietnam with the Communist Party line[32] and to conduct name checks on leading antiwar Senators.[33]

(f) As part of their effort to collect information which "related even remotely" to people or groups "active" in communities which had "the potential" for civil disorder, Army intelligence agencies took such steps as: sending agents to a Halloween party for elementary school children in Washington, D.C., because they suspected a local "dissident" might be present; monitoring protests of welfare mothers' organizations in Milwaukee; infiltrating a coalition of church youth groups in Colorado; and sending agents to a priests' conference in Washington, D.C., held to discuss birth control measures.[34]

(g) In the late 1960's and early 1970's, student groups were subjected to intense scrutiny. In 1970 the FBI ordered investigations of every member of the Students for a Democratic Society and of "every Black Student Union and similar group regardless of their past or

---

[27] Memorandum from F. J. Baumgardner to William C. Sullivan, 5/29/63.

[28] Memorandum from Oklahoma City Field Office to FBI Headquarters, 9/19/41. See Development of FBI Domestic Intelligence Investigations: Section IV, "FBI Target Lists."

[29] Chief Robert Shackleford testimony, 2/6/76, p. 91.

[30] Senate Judiciary Subcommittee on Constitutional Rights, Report, 1973, p. 57.

[31] Senate Select Committee Staff summary of HTLINGUAL File Review, 9/5/75.

[32] FBI Summary Memorandum, 1/31/75, re: Coverage of T.V. Presentation.

[33] Letter from J. Edgar Hoover to Marvin Watson, 7/15/66.

[34] See Military Report: Sec. II, "The Collection of Information About the Political Activities of Private Citizens and Private Organizations."

9

present involvement in disorders." [35] Files were opened on thousands of young men and women so that, as the former head of FBI intelligence explained, the information could be used if they ever applied for a government job.[36]

In the 1960's Bureau agents were instructed to increase their efforts to discredit "New Left" student demonstrators by tactics including publishing photographs ("naturally the most obnoxious picture should be used"),[37] using "misinformation" to falsely notify members events had been cancelled,[38] and writing "tell-tale" letters to students' parents.[39]

(h) The FBI Intelligence Division commonly investigated any indication that "subversive" groups already under investigation were seeking to influence or control other groups.[40] One example of the extreme breadth of this "infiltration" theory was an FBI instruction in the mid-1960's to all Field Offices to investigate every "free university" because some of them had come under "subversive influence." [41]

(i) Each administration from Franklin D. Roosevelt's to Richard Nixon's permitted, and sometimes encouraged, government agencies to handle essentially political intelligence. For example:

—President Roosevelt asked the FBI to put in its files the names of citizens sending telegrams to the White House opposing his "national defense" policy and supporting Col. Charles Lindbergh.[42]

—President Truman received inside information on a former Roosevelt aide's efforts to influence his appointments,[43] labor union negotiating plans,[44] and the publishing plans of journalists.[45]

—President Eisenhower received reports on purely political and social contacts with foreign officials by Bernard Baruch,[46] Mrs. Eleanor Roosevelt,[47] and Supreme Court Justice William O. Douglas.[47a]

—The Kennedy Administration had the FBI wiretap a Congressional staff member,[48] three executive officials,[49] a lobbyist,[50] and a Washington law firm.[51] Attorney General Robert F. Kennedy received the fruits of a FBI "tap" on Martin Luther King, Jr.,[52] and a "bug" on a Congressman both of which yielded information of a political nature.[53]

[35] Memorandum from FBI headquarters to all SAC's, 11/4/70.
[36] Charles Brennan testimony, 9/25/75, Hearings, vol. 2 p. 117.
[37] Memorandum from FBI Headquarters to all SAC's, 7/5/68.
[38] Abstracts of New Left Documents #161, 115, 43. Memorandum from Washington Field Office to FBI Headquarters, 1/21/69.
[39] Memorandum from FBI Headquarters to Cleveland Field Office, 11/29/68.
[40] FBI Manual of Instructions, Sec. 87, B (2-f).
[41] Memorandum from FBI Headquarters to San Antonio Field Office, 7/23/69.
[42] Memorandum from Stephen Early to J. Edgar Hoover, 5/21/40; 6/17/40.
[43] Letter from J. Edgar Hoover to George Allen, 12/3/46.
[44] Letter from J. Edgar Hoover to Maj. Gen. Harry Vaughn, 2/15/47.
[45] Letter from J. Edgar Hoover to M. J. Connelly, 1/27/50.
[46] Letter from J. Edgar Hoover to Dillon Anderson, 11/7/55.
[47] Letter from J. Edgar Hoover to Robert Cutler, 2/13/58.
[47a] Letters from J. Edgar Hoover to Robert Cutler, 4/21/53–4/27/53.
[48] Memorandum from J. Edgar Hoover to the Attorney General, 2/16/61.
[49] Memorandum from J. Edgar Hoover to the Attorney General, 2/14/61.
[50] Memorandum from J. Edgar Hoover to the Attorney General, 2/16/61.
[51] Memorandum from J. Edgar Hoover to the Attorney General 6/26/62.
[52] Memorandum from Charles Brennan to William Sullivan, 12/19/66.
[53] Memorandum from J. Edgar Hoover to the Attorney General, 2/18/61.

10

—President Johnson asked the FBI to conduct "name checks" of his critics and of members of the staff of his 1964 opponent, Senator Barry Goldwater.[54] He also requested purely political intelligence on his critics in the Senate, and received extensive intelligence reports on political activity at the 1964 Democratic Convention from FBI electronic surveillance.[55]

—President Nixon authorized a program of wiretaps which produced for the White House purely political or personal information unrelated to national security, including information about a Supreme Court justice.[56]

*3. Covert Action and the Use of Illegal or Improper Means*

(a) *Covert Action.*—Apart from uncovering excesses in the collection of intelligence, our investigation has disclosed covert actions directed against Americans, and the use of illegal and improper surveillance techniques to gather information. For example:

(i) The FBI's COINTELPRO—counterintelligence program—was designed to "disrupt" groups and "neutralize" individuals deemed to be threats to domestic security. The FBI resorted to counterintelligence tactics in part because its chief officials believed that the existing law could not control the activities of certain dissident groups, and that court decisions had tied the hands of the intelligence community. Whatever opinion one holds about the policies of the targeted groups, many of the tactics employed by the FBI were indisputably degrading to a free society. COINTELPRO tactics included:

—Anonymously attacking the political beliefs of targets in order to induce their employers to fire them;

—Anonymously mailing letters to the spouses of intelligence targets for the purpose of destroying their marriages;[57]

—Obtaining from IRS the tax returns of a target and then attempting to provoke an IRS investigation for the express purpose of deterring a protest leader from attending the Democratic National Convention;[58]

—Falsely and anonymously labeling as Government informants members of groups known to be violent, thereby exposing the falsely labelled member to expulsion or physical attack;[59]

—Pursuant to instructions to use "misinformation" to disrupt demonstrations, employing such means as broadcasting fake orders on the same citizens band radio frequency used by demonstration marshals to attempt to control demonstrations,[60] and duplicating and falsely filling out forms soliciting housing for persons coming to a demonstration, thereby causing "long and useless journeys to locate these addresses";[61]

[54] Memorandum from J. Edgar Hoover to Bill Moyers, 10/27/64.
[55] Memorandum from C. D. DeLoach to John Mohr, 8/29/64.
[56] Letter from J. Edgar Hoover to H.R. Haldeman, 6/25/70.
[57] Memorandum from FBI Headquarters, to San Francisco Field Office, 11/26/68.
[58] Memorandum from [Midwest City] Field Office to FBI Headquarters, 8/1/68; memorandum from FBI Headquarters to [Midwest City] Field Office, 8/6/68.
[59] Memorandum from Columbia Field Office to FBI Headquarters, 11/4/70, re: COINTELPRO-New Left.
[60] Memorandum from Charles Brennan to William Sullivan, 8/15/68.
[61] Memorandum from Chicago Field Office to FBI Headquarters, 9/9/68.

11

—Sending an anonymous letter to the leader of a Chicago street gang (described as "violence-prone") stating that the Black Panthers were supposed to have "a hit out for you". The letter was suggested because it "may intensify . . . animosity" and cause the street gang leader to "take retaliatory action".[62]

(ii) From "late 1963" until his death in 1968, Martin Luther King, Jr., was the target of an intensive campaign by the Federal Bureau of Investigation to "neutralize" him as an effective civil rights leader. In the words of the man in charge of the FBI's "war" against Dr. King, "No holds were barred."[63]

The FBI gathered information about Dr. King's plans and activities through an extensive surveillance program, employing nearly every intelligence-gathering technique at the Bureau's disposal in order to obtain information about the "private activities of Dr. King and his advisors" to use to "completely discredit" them.[64]

The program to destroy Dr. King as the leader of the civil rights movement included efforts to discredit him with Executive branch officials, Congressional leaders, foreign heads of state, American ambassadors, churches, universities, and the press.[65]

The FBI mailed Dr. King a tape recording made from microphones hidden in his hotel rooms which one agent testified was an attempt to destroy Dr. King's marriage.[66] The tape recording was accompanied by a note which Dr. King and his advisors interpreted as threatening to release the tape recording unless Dr. King committed suicide.[67]

The extraordinary nature of the campaign to discredit Dr. King is evident from two documents:

—At the August 1963 March on Washington, Dr. King told the country of his "dream" that:

> all of God's children, black men and white men, Jews and Gentiles, Protestants and Catholics, will be able to join hands and sing in the words of the old Negro spiritual, "Free at last, free at last, thank God Almightly, I'm free at last."

The Bureau's Domestic Intelligence Division concluded that this "demagogic speech" established Dr. King as the "most dangerous and effective Negro leader in the country."[68] Shortly afterwards, and within days after Dr. King was named "Man of the Year" by *Time* magazine, the FBI decided to "take him off his pedestal," reduce him completely in influence," and select and promote its own candidate to "assume the role of the leadership of the Negro people."[69]

—In early 1968, Bureau headquarters explained to the field that Dr. King must be destroyed because he was seen as a potential "messiah" who could "unify and electrify" the "black nationalist movement". Indeed, to the FBI he was a potential threat because he might "aban-

---

[62] Memorandum from FBI Headquarters to Chicago Field Office. 1/30/69 re: COINTELPRO, Black Nationalist-Hate Groups.
[63] William C. Sullivan testimony, 11/1/75, p. 49.
[64] Memorandum from Baumgardner to Sullivan, 2/4/64.
[65] Memorandum from Chicago Field Office to FBI Headquarters, 12/16/68; memorandum from FBI Headquarters to Chicago Field Office, 1/30/69, re: COINTELPRO, Black Nationalist-Hate Groups.
[66] William C. Sullivan, 11/1/75, pp. 104–105.
[67] Andrew Young testimony, 2/19/76, p. 8.
[68] Memorandum from Sullivan to Belmont, 8/30/63.
[69] Memorandum from Sullivan to Belmont, 1/8/64.

12

don his supposed 'obedience' to white liberal doctrines (non-violence)." [70] In short, a non-violent man was to be secretly attacked and destroyed as insurance against his abandoning non-violence.

(b) *Illegal or Improper Means.*—The surveillance which we investigated was not only vastly excessive in breadth and a basis for degrading counterintelligence actions, but was also often conducted by illegal or improper means. For example:

(1) For approximately 20 years the CIA carried out a program of indiscriminately opening citizens' first class mail. The Bureau also had a mail opening program, but cancelled it in 1966. The Bureau continued, however, to receive the illegal fruits of CIA's program. In 1970, the heads of both agencies signed a document for President Nixon, which correctly stated that mail opening was illegal, falsely stated that it had been discontinued, and proposed that the illegal opening of mail should be resumed because it would provide useful results. The President approved the program, but withdrew his approval five days later. The illegal opening continued nonetheless. Throughout this period CIA officials knew that mail opening was illegal, but expressed concern about the "flap potential" of exposure, not about the illegality of their activity.[71]

(2) From 1947 until May 1975, NSA received from international cable companies millions of cables which had been sent by American citizens in the reasonable expectation that they would be kept private.[72]

(3) Since the early 1930's, intelligence agencies have frequently wiretapped and bugged American citizens without the benefit of judicial warrant. Recent court decisions have curtailed the use of these techniques against domestic targets. But past subjects of these surveillances have included a United States Congressman, a Congressional staff member, journalists and newsmen, and numerous individuals and groups who engaged in no criminal activity and who posed no genuine threat to the national security, such as two White House domestic affairs advisers and an anti-Vietnam War protest group. While the prior written approval of the Attorney General has been required for all warrantless wiretaps since 1940, the record is replete with instances where this requirement was ignored and the Attorney General gave only after-the-fact authorization.

Until 1965, microphone surveillance by intelligence agencies was wholly unregulated in certain classes of cases. Within weeks after a 1954 Supreme Court decision denouncing the FBI's installation of a microphone in a defendant's bedroom, the Attorney General informed the Bureau that he did not believe the decision applied to national security cases and

[70] Memorandum from FBI Headquarters to all SACs, 3/4/68.
[71] See Mail Opening Report: Section II, "Legal Considerations and the 'Flap' Potential."
[72] See NSA Report: Section I, "Introduction and Summary."

13

permitted the FBI to continue to install microphones subject only to its own "intelligent restraint".[73]

(4) In several cases, purely political information (such as the reaction of Congress to an Administration's legislative proposal) and purely personal information (such as coverage of the extra-marital social activities of a high-level Executive official under surveillance) was obtained from electronic surveillance and disseminated to the highest levels of the federal government.[74]

(5) Warrantless break-ins have been conducted by intelligence agencies since World War II. During the 1960's alone, the FBI and CIA conducted hundreds of break-ins, many against American citizens and domestic organizations. In some cases, these break-ins were to install microphones; in other cases, they were to steal such items as membership lists from organizations considered "subversive" by the Bureau.[75]

(6) The most pervasive surveillance technique has been the informant. In a random sample of domestic intelligence cases, 83% involved informants and 5% involved electronic surveillance.[76] Informants have been used against peaceful, law-abiding groups; they have collected information about personal and political views and activities.[77] To maintain their credentials in violence-prone groups, informants have involved themselves in violent activity. This phenomenon is well illustrated by an informant in the Klan. He was present at the murder of a civil rights worker in Mississippi and subsequently helped to solve the crime and convict the perpetrators. Earlier, however, while performing duties paid for by the Government, he had previously "beaten people severely, had boarded buses and kicked people, had [gone] into restaurants and beaten them [blacks] with blackjacks, chains, pistols." [78] Although the FBI requires agents to instruct informants that they cannot be involved in violence, it was understood that in the Klan, "he couldn't be an angel and be a good informant." [79]

*4. Ignoring the Law*

Officials of the intelligence agencies occasionally recognized that certain activities were illegal, but expressed concern only for "flap potential." Even more disturbing was the frequent testimony that the law, and the Constitution were simply ignored. For example, the author of the so-called Huston plan testified:

*Question.* Was there any person who stated that the activity recommended, which you have previously identified as being

[73] Memorandum from Attorney General Brownell to J. Edgar Hoover, 5/20/54.
[74] See finding on Political Abuse. To protect the privacy of the targeted individual, the Committee has omitted the citation to the memorandum concerning the example of purely personal information.
[75] Memorandum from W. C. Sullivan to C. D. DeLoach, 7/19/66, p. 2.
[76] General Accounting Office Report on Domestic Intelligence Operations of the FBI, 9/75.
[77] Mary Jo Cook testimony, 12/2/75, Hearings, Vol. 6, p. 111.
[78] Gary Rowe deposition, 10/17/75, p. 9.
[79] Special Agent No. 3 deposition, 11/21/75, p. 12.

14

illegal opening of the mail and breaking and entry or bur-
glary—was there any single person who stated that such ac-
tivity should not be done because it was unconstitutional?
    Answer. No.
    *Question.* Was there any single person who said such activ-
ity should not be done because it was illegal?
    Answer. No.[80]

Similarly, the man who for ten years headed FBI's Intelligence
Division testifed that:

> . . . never once did I hear anybody, including myself, raise the
> question: "Is this course of action which we have agreed upon
> lawful, is it legal, is it ethical or moral." We never gave any
> thought to this line of reasoning, because we were just natu-
> rally pragmatic.[81]

Although the statutory law and the Constitution were often not
"[given] a thought",[82] there was a general attitude that intelligence
needs were responsive to a higher law. Thus, as one witness testified
in justifying the FBI's mail opening program:

> It was my assumption that what we were doing was justified
> by what we had to do . . . the greater good, the national
> security.[83]

## 5. *Deficiencies in Accountability and Control*

The overwhelming number of excesses continuing over a prolonged
period of time were due in large measure to the fact that the system
of checks and balances—created in our Constitution to limit abuse of
Governmental power—was seldom applied to the intelligence com-
munity. Guidance and regulation from outside the intelligence agen-
cies—where it has been imposed at all—has been vague. Presidents
and other senior Executive officials, particularly the Attorneys Gen-
eral, have virtually abdicated their Constitutional responsibility to
oversee and set standards for intelligence activity. Senior government
officials generally gave the agencies broad, general mandates or
pressed for immediate results on pressing problems. In neither case
did they provide guidance to prevent excesses and their broad
mandates and pressures themselves often resulted in excessive or
improper intelligence activity.

Congress has often declined to exercise meaningful oversight, and
on occasion has passed laws or made statements which were taken by
intelligence agencies as supporting overly-broad investigations.

---

[80] Huston testimony, 9/23/75. Hearings, Vol. 2, p. 41.

[81] William Sullivan testimony, 11/1/75, pp. 92–93.

[82] The quote is from a Bureau official who had supervised for the "Black
Nationalist Hate Group" COINTELPRO.

    "*Question.* Did anybody at any time that you remember during the course of
the programs discuss the Constitutionality or the legal authority, or anything
else like that?

    "Answer. No, we never gave it a thought. As far as I know, nobody engaged
or ever had any idea that they were doing anything other than what was the
policy of the Bureau which had been policy for a long time." (George Moore
deposition, 11/3/75, p. 83.)

[83] Branigan, 10/9/75, p. 41.

15

On the other hand, the record reveals instances when intelligence agencies have concealed improper activities from their superiors in the Executive branch and from the Congress, or have elected to disclose only the less questionable aspects of their activities.

There has been, in short, a clear and sustained failure by those responsible to control the intelligence community and to ensure its accountability. There has been an equally clear and sustained failure by intelligence agencies to fully inform the proper authorities of their activities and to comply with directives from those authorities.

### 6. The Adverse Impact of Improper Intelligence Activity

Many of the illegal or improper disruptive efforts directed against American citizens and domestic organizations succeeded in injuring their targets. Although it is sometimes difficult to prove that a target's misfortunes were caused by a counter-intelligence program directed against him, the possibility that an arm of the United States Government intended to cause the harm and might have been responsible is itself abhorrent.

The Committee has observed numerous examples of the impact of intelligence operations. Sometimes the harm was readily apparent— destruction of marriages, loss of friends or jobs. Sometimes the attitudes of the public and of Government officials responsible for formulating policy and resolving vital issues were influenced by distorted intelligence. But the most basic harm was to the values of privacy and freedom which our Constitution seeks to protect and which intelligence activity infringed on a broad scale.

*(a) General Efforts to Discredit.*—Several efforts against individuals and groups appear to have achieved their stated aims. For example:

—A Bureau Field Office reported that the anonymous letter it had sent to an activist's husband accusing his wife of infidelity "contributed very strongly" to the subsequent breakup of the marriage.[84]

—Another Field Office reported that a draft counsellor deliberately, and falsely, accused of being an FBI informant was "ostracized" by his friends and associates.[85]

—Two instructors were reportedly put on probation after the Bureau sent an anonymous letter to a university administrator about their funding of an anti-administration student newspaper.[86]

—The Bureau evaluated its attempts to "put a stop" to a contribution to the Southern Christian Leadership Conference as "quite successful."[87]

—An FBI document boasted that a "pretext" phone call to Stokeley Carmichael's mother telling her that members of the Black Panther Party intended to kill her son left her "shocked". The memorandum intimated that the Bureau believed it had been responsible for Carmichael's flight to Africa the following day.[88]

*(b) Media Manipulation.*—The FBI has attempted covertly to influence the public's perception of persons and organizations by disseminating derogatory information to the press, either anonymously or through "friendly" news contacts. The impact of those articles is

---

[84] Memorandum from St. Louis Field Office to FBI Headquarters, 6/19/70.
[85] Memorandum from San Diego Field Office to FBI Headquarters, 4/30/69.
[86] Memorandum from Mobile Field Office to FBI Headquarters, 12/9/70.
[87] Memorandum from Wick to DeLoach, 11/9/66.
[88] Memorandum from New York Field Office to FBI Headquarters, 9/9/68.

16

generally difficult to measure, although in some cases there are fairly
direct connections to injury to the target. The Bureau also attempted
to influence media reporting which would have any impact on the pub-
lic image of the FBI. Examples include:

—Planting a series of derogatory articles about Martin Luther
King, Jr., and the Poor People's Campaign.[89]

For example, in anticipation of the 1968 "poor people's march on
Washington, D.C.," Bureau Headquarters granted authority to
furnish "cooperative news media sources" an article "designed to cur-
tail success of Martin Luther King's fund raising." [90] Another memo-
randum illustrated how "photographs of demonstrators" could be used
in discrediting the civil rights movement. Six photographs of partic-
ipants in the poor people's campaign in Cleveland accompanied the
memorandum with the following note attached: "These [photo-
graphs] show the militant aggressive appearance of the participants
and might be of interest to a cooperative news source." [91] Information
on the Poor People's Campaign was provided by the FBI to friendly
reporters on the condition that "the Bureau must not be revealed as
the source." [92]

—Soliciting information from Field Offices "on a continuing basis"
for "prompt . . . dissemination to the news media . . . to discredit
the New Left movement and its adherents." The Headquarters direc-
tive requested, among other things, that:

> specific data should be furnished depicting the scurrilous and
> depraved nature of many of the characters, activities, habits
> and living conditions representative of New Left adherents.

Field Offices were to be exhorted that: "Every avenue of possible em-
barrassment must be vigorously and enthusiastically explored." [93]

—Ordering Field Offices to gather information which would dis-
prove allegations by the "liberal press, the bleeding hearts, and the
forces on the left" that the Chicago police used undue force in dealing
with demonstrators at the 1968 Democratic Convention.[95]

—Taking advantage of a close relationship with the Chairman of
the Board—described in an FBI memorandum as "our good friend"—
of a magazine with national circulation to influence articles which re-
lated to the FBI. For example, through this relationship the Bureau:
"squelched" an "unfavorable article against the Bureau" written by a
free-lance writer about an FBI investigation; "postponed publication"
of an article on another FBI case; "forestalled publication" of an ar-
ticle by Dr. Martin Luther King, Jr.; and received information about
proposed editing of King's articles.[96]

### (c) Distorting Data to Influence Government Policy and Pub-<br>lic Perceptions

Accurate intelligence is a prerequisite to sound government policy.
However, as the past head of the FBI's Domestic Intelligence Division
reminded the Committee:

[89] See King Report: Sections V and VII.
[90] Memorandum from G. C. Moore to W. C. Sullivan, 10/26/68.
[91] Memorandum from G. C. Moore to W. C. Sullivan, 5/17/68.
[92] Memorandum from FBI Headquarters to Miami Field Office, 7/9/68.
[93] Memorandum from C. D. Brennan to W. C. Sullivan, 5/22/68.
[95] Memorandum from FBI Headquarters to Chicago Field Office, 8/28/68.
[96] Memorandum from W. H. Stapleton to DeLoach, 11/3/64.

17

> The facts by themselves are not too meaningful. They are
> something like stones cast into a heap.[97]

On certain crucial subjects the domestic intelligence agencies reported the "facts" in ways that gave rise to misleading impressions.

For example, the FBI's Domestic Intelligence Division initially discounted as an "obvious failure" the alleged attempts of Communists to influence the civil rights movement.[98] Without any significant change in the factual situation, the Bureau moved from the Division's conclusion to Director Hoover's public congressional testimony characterizing Communist influence on the civil rights movement as "vitally important."[98a]

FBI reporting on protests against the Vietnam War provides another example of the manner in which the information provided to decision-makers can be skewed. In acquiescence with a judgment already expressed by President Johnson, the Bureau's reports on demonstrations against the War in Vietnam emphasized Communist efforts to influence the anti-war movement and underplayed the fact that the vast majority of demonstrators were not Communist controlled.[99]

(d) *"Chilling" First Amendment Rights.*—The First Amendment protects the Rights of American citizens to engage in free and open discussions, and to associate with persons of their choosing. Intelligence agencies have, on occasion, expressly attempted to interfere with those rights. For example, one internal FBI memorandum called for "more interviews" with New Left subjects "to enhance the paranoia endemic in these circles" and "get the point across there is an FBI agent behind every mailbox."[100]

More importantly, the government's surveillance activities in the aggregate—whether or not expressly intended to do so—tends, as the Committee concludes at p. 290 to deter the exercise of First Amended rights by American citizens who become aware of the government's domestic intelligence program.

(e) *Preventing the Free Exchange of Ideas.* Speakers, teachers, writers, and publications themselves were targets of the FBI's counterintelligence program. The FBI's efforts to interfere with the free exchange of ideas included:

—Anonymously attempting to prevent an alleged "Communist-front" group from holding a forum on a midwest campus, and then investigating the judge who ordered that the meeting be allowed to proceed.[101]

—Using another "confidential source" in a foundation which contributed to a local college to apply pressure on the school to fire an activist professor.

—Anonymously contacting a university official to urge him to "persuade" two professors to stop funding a student newspaper, in order to "eliminate what voice the New Left has" in the area.

---

[97] Sullivan, 11/1/75, p. 48.
[98] Memorandum from Baumgardner to Sullivan, 8/26/63 p. 1. Hoover himself construed the initial Division estimate to mean that Communist influence was "infinitesimal."
[98a] See Finding on Political Abuse, p. 225.
[99] See Finding on Political Abuse, p. 225.
[100] "New Left Notes—Philadelphia," 9/16/70, Edition #1.
[101] Memorandum from Detroit Field Office to FBI Headquarters 10/26/60; Memorandum from FBI Headquarters to Detroit Field Office 10/27, 28, 31/60; Memorandum from Baumgardner to Belmont, 10/26/60.

18

—Targeting the New Mexico Free University for teaching "confrontation politics" and "draft counseling training".[102]

### 7. Cost and Value

Domestic intelligence is expensive. We have already indicated the cost of illegal and improper intelligence activities in terms of the harm to victims, the injury to constitutional values, and the damage to the democratic process itself. The cost in dollars is also significant. For example, the FBI has budgeted for fiscal year 1976 over $7 million for its domestic security informant program, more than twice the amount it spends on informants against organized crime.[103] The aggregate budget for FBI domestic security intelligence and foreign counterintelligence is at least $80 million.[104] In the late 1960s and early 1970s, when the Bureau was joined by the CIA, the military, and NSA in collecting information about the anti-war movement and black activists, the cost was substantially greater.

Apart from the excesses described above, the usefulness of many domestic intelligence activities in serving the legitimate goal of protecting society has been questionable. Properly directed intelligence investigations concentrating upon hostile foreign agents and violent terrorists can produce valuable results. The Committee has examined cases where the FBI uncovered "illegal" agents of a foreign power engaged in clandestine intelligence activities in violation of federal law. Information leading to the prevention of serious violence has been acquired by the FBI through its informant penetration of terrorist groups and through the inclusion in Bureau files of the names of persons actively involved with such groups.[105] Nevertheless, the most sweeping domestic intelligence surveillance programs have produced surprisingly few useful returns in view of their extent. For example:

---

[102] See COINTELPRO Report: Section III. "The Goals of COINTELPRO: Preventing or disrupting the exercise of First Amendment Rights."

[103] The budget for FBI informant programs includes not only the payments to informants for their services and expenses, but also the expenses of FBI personnel who supervise informants, their support costs, and administrative overhead. (Justice Department letter to Senate Select Committee, 3/2/76).

[104] The Committee is withholding the portion of this figure spent on domestic security intelligence (informants and other investigations combined) to prevent hostile foreign intelligence services from deducing the amount spent on counterespionage. The $80 million figure does not include all costs of separate FBI activities which may be drawn upon for domestic security intelligence purposes. Among these are the Identification Division (maintaining fingerprint records), the Files and Communications Division (managing the storage and retrieval of investigative and intelligence files), and the FBI Laboratory.

[105] Examples of valuable informant reports include the following: one informant reported a plan to ambush police officers and the location of a cache of weapons and dynamite; another informant reported plans to transport illegally obtained weapons to Washington, D.C.; two informants at one meeting discovered plans to dynamite two city blocks. All of these plans were frustrated by further investigation and protective measures or arrest. (FBI memorandum to Select Committee, 12/10/75; Senate Select Committee Staff memorandum: Intelligence Cases in Which the FBI Prevented Violence, undated.)

One example of the use of information in Bureau files involved a "name check" at Secret Service request on certain persons applying for press credentials to cover the visit of a foreign head of state. The discovery of data in FBI files indicating that one such person had been actively involved with violent groups led to further investigation and ultimately the issuance of a search warrant. The search produced evidence, including weapons, of a plot to assassinate the foreign head of state. (FBI memorandum to Senate Select Committee, 2/23/76)

19

—Between 1960 and 1974, the FBI conducted over 500,000 separate investigations of persons and groups under the "subversive" category, predicated on the possibility that they might be likely to overthrow the government of the United States.[106] Yet not a single individual or group has been prosecuted since 1957 under the laws which prohibit planning or advocating action to overthrow the government and which are the main alleged statutory basis for such FBI investigations.[107]

—A recent study by the General Accounting Office has estimated that of some 17,528 FBI domestic intelligence investigations of individuals in 1974, only 1.3 percent resulted in prosecution and conviction, and in only "about 2 percent" of the cases was advance knowledge of any activity—legal or illegal—obtained.[108]

—One of the main reasons advanced for expanded collection of intelligence about urban unrest and anti-war protest was to help responsible officials cope with possible violence. However, a former White House official with major duties in this area under the Johnson administration has concluded, in retrospect, that "in none of these situations . . . would advance intelligence about dissident groups [have] been of much help," that what was needed was "physical intelligence" about the geography of major cities, and that the attempt to "predict violence" was not a "successful undertaking."[109]

—Domestic intelligence reports have sometimes even been counterproductive. A local police chief, for example, described FBI reports which led to the positioning of federal troops near his city as:

> . . . almost completely composed of unsorted and unevaluated stories, threats, and rumors that had crossed my desk in New Haven. Many of these had long before been discounted by our Intelligence Division. But they had made their way from New Haven to Washington, had gained completely unwarranted credibility, and had been submitted by the Director of the FBI to the President of the United States. They seemed to present a convincing picture of impending holocaust.[110]

In considering its recommendations, the Committee undertook an evaluation of the FBI's claims that domestic intelligence was necessary to combat terrorism, civil disorders, "subversion," and hostile

[106] This figure is the number of "investigative matters" handled by the FBI in this area, including as separate items the investigative leads in particular cases which are followed up by various field offices. (FBI memorandum to Select Committee, 10/6/75.)
[107] Schackelford 2/13/76, p. 32. This official does not recall any targets of "subversive" investigations having been even referred to a Grand Jury under these statutes since the 1950s.
[108] "FBI Domestic Intelligence Operations—Their Purpose and Scope: Issues That Need To Be Resolved," Report by the Comptroller General to the House Judiciary Committee, 2/24/76, pp. 138–147. The FBI contends that these statistics may be unfair in that they concentrate on investigations of individuals rather than groups. (Ibid., Appendix V) In response, GAO states that its "sample of organization and control files was sufficient to determine that generally the FBI did not report advance knowledge of planned violence." In most of the fourteen instances where such advance knowledge was obtained, it related to "such activities as speeches, demonstrations or meetings—all essentially nonviolent." (Ibid., p. 144)
[109] Joseph Califano testimony, 1/27/76, pp. 7–8.
[110] James Ahern testimony, 1/20/76, pp. 16, 17.

20

foreign intelligence activity. The Committee reviewed voluminous materials bearing on this issue and questioned Bureau officials, local police officials, and present and former federal executive officials.

We have found that we are in fundamental agreement with the wisdom of Attorney General Stone's initial warning that intelligence agencies must not be "concerned with political or other opinions of individuals" and must be limited to investigating essentially only "such conduct as is forbidden by the laws of the United States." The Committee's record demonstrates that domestic intelligence which departs from this standard raises grave risks of undermining the democratic process and harming the interests of individual citizens. This danger weighs heavily against the speculative or negligible benefits of the ill-defined and overbroad investigations authorized in the past. Thus, the basic purpose of the recommendations contained in Part IV of this report is to limit the FBI to investigating conduct rather than ideas or associations.

The excesses of the past do not, however, justify depriving the United States of a clearly defined and effectively controlled domestic intelligence capability. The intelligence services of this nation's international adversaries continue to attempt to conduct clandestine espionage operations within the United States.[111] Our recommendations provide for intelligence investigations of hostile foreign intelligence activity.

Moreover, terrorists have engaged in serious acts of violence which have brought death and injury to Americans and threaten further such acts. These acts, not the politics or beliefs of those who would commit them, are the proper focus for investigations to anticipate terrorist violence. Accordingly, the Committee would permit properly controlled intelligence investigations in those narrow circumstances.[112]

Concentration on imminent violence can avoid the wasteful dispersion of resources which has characterized the sweeping (and fruitless) domestic intelligence investigations of the past. But the most important reason for the fundamental change in the domestic intelligence operations which our Recommendations propose is the need to protect the constitutional rights of Americans.

In light of the record of abuse revealed by our inquiry, the Committee is not satisfied with the position that mere exposure of what has occurred in the past will prevent its recurrence. Clear legal standards and effective oversight and controls are necessary to ensure that domestic intelligence activity does not itself undermine the democratic system it is intended to protect.

[111] An indication of the scope of the problem is the increasing number of official representatives of communist governments in the United States. For example, the number of Soviet officials in this country has increased from 333 in 1961 to 1,079 by early 1975. There were 2,683 East-West exchange visitors and 1,500 commercial visitors in 1974. (FBI Memorandum, "Intelligence Activities Within the United States by Foreign Governments," 3/20/75.)

[112] According to the FBI, there were 89 bombings attributable to terrorist activity in 1975, as compared with 45 in 1974 and 24 in 1973. Six persons died in terrorist-claimed bombings and 76 persons were injured in 1975. Five other deaths were reported in other types of terrorist incidents. Monetary damage reported in terrorist bombings exceeded 2.7 million dollars. It should be noted, however, that terrorist bombings are only a fraction of the total number of bombings in this country. Thus, the 89 terrorist bombings in 1975 were among a total of over 1,900 bombings, most of which were not, according to the FBI, attributable clearly to terrorist activity. (FBI memorandum to Senate Select Committee, 2/23/76.)